## POPE v. MATHEWS.

1. A testator directed his executor to invest the proceeds of certain sales, and his cash and choses in action "in bank stock or otherwise." At his death, testator held note of long standing against A., one against B. with A. as surety, and another against C. The executor permitted A. to renew his own note, and also with his own note to take up the notes of B. and C., neither of these new notes of A. having any surety or other security. The executor lent other of this fund to D. in April, 1860, under D.'s promise to furnish good security, which was never done. A. and D. were perfect by solvent when their notes were taken, but after the war were insolvent, and the fund was lost in part to the estate. *Held,* that the executor was not liable for the losses on these notes. Mr. Justice McIver, *dissenting,* except as to the renewal of A.'s individual note.

2. *Nance* v. *Nance,* 1 *S. C.* 218, modified. Mr. Justice Aldrich, *dissenting.*

---

Before Kershaw, J., Newberry, November, 1880.

This was a bill in equity filed in 1867, by Francis M. Pope, V. J. Tobias and Josephine M., his wife, against Bird C. Mathews, as executor of the will of Jacob Pope, deceased.

Jacob Pope died in August, 1849, leaving of force a will, whereby he gave his entire estate to his wife for life, and certain personalty absolutely. The last two clauses were as follows:

4. I give all the rest, residue and remainder of my estate to my grandson, Jacob Pope Rutherford, in fee-simple, after the death of my wife; and I direct my executors to take charge of the property and manage the same for his benefit until he shall attain the age of twenty-one years, selling such portions of the property as they shall see fit (excepting the land and negroes, which are not to be sold), and to invest the proceeds of the sale, and the cash and choses in action, in bank stock or otherwise.

5. I nominate and appoint Thomas H. Pope and Bud C. Matthews executors of this, my last will and testament.

There was a codicil to this will in the words following:

"If my grandson, Jacob Pope Rutherford, should die without leaving issue then living, all the property and estate given to him by my said will shall go to the children then living, of my son, Mark F. Pope, deceased, to be equally divided among them; but neither of the children of my said son shall receive his or her share until he or she shall attain the age of twenty-five years. This codicil is to go into effective operation if my said grandson, Jacob Pope Rutherford, shall die without leaving issue then living, whether it shall so happen in my life-time or after my death, and at whatever age he may so die without leaving issue then living."

The defendant, Bud C. Mathews, alone qualified as executor. The widow of testator died in 1858, and Jacob Pope Rutherford, without issue, in 1859. The children of Mark F. Pope, living at the death of Rutherford in 1859, were the present plaintiffs, F. M. Pope and V. J. Tobias, who respectively attained the age of twenty-five years in 1865 and 1867.

Many of the issues in this cause were settled by the referee and the Circuit judge. The questions brought to this court were based upon the following facts: At the time of his death, testator held a note on John Belton O'Neall, who was then a judge of our Law Courts, and afterwards Chief Justice of the Appeal Court. This note, dated September 15th, 1840, was for $688.76, and was unsecured. It was renewed to the executor December 31st, 1853, for $1,329.54, without any security. There was another note against George Pope and Judge O'Neall, dated in 1839 or 1840, for $3,594.30, with credits. George

Pope died soon after testator, and Judge O'Neall was his execu-
tor. In September, 1855, Mathews, executor, allowed Judge
O'Neall to give his own unsecured note for $4,275.57, and
thereby to take up the George Pope note, including, says the
executor in his testimony, "a debt of $1,000, which Thomas H.
Pope took out of Jacob Pope's estate and used."

In April, 1860, Mathews let one Ramage have $600 of the
estate money, under Ramage's promise to furnish security to the
note then given, which, however, was never done. Mathews
testified that Ramage was to "give security, but war came on
and he did not." Ramage testified to the same effect.

It was fully proved by the testimony of many witnesses that
before the war Judge O'Neall was a man of large estate, and
that both he and Ramage were abundantly solvent and in good
credit; that it was not customary for solvent men to secure their
notes by mortgage, and that to ask a solvent man for a mortgage
was considered an insult. Both Judge O'Neall's estate and Ram-
age were insolvent after the war. From the former nothing was
collected during his life-time (he died during the war), and only
a small amount since; from the latter, nothing has been received,
and it is doubtful whether any amount can be collected.

The plaintiffs claim that the defendant is liable for these three
notes, with interest from the death of Jacob Pope Rutherford.
The referee so reported, and ordered the defendant to pay the
costs of the action. Upon exceptions to this report, the cause
came on to be heard before Judge Kershaw, who filed the fol-
lowing decree :

This case was heard upon exceptions to the report of J. F. J.
Caldwell, Esq., referee.

The first question I will consider is, whether the executor is
accountable for the loss which has ensued in consequence of the
insolvency of the O'Neall notes, and his failure to collect them
when they were collectible.

I do not regard the case as the same with that of a trustee,
who, having funds in his hands to invest, puts them out upon
personal securities without surety or collateral. These notes were
never collected by the executor. They were simply renewed; the

debt remained the same. It is true the note of Judge O'Neall alone was taken as a renewal of the joint and several notes of Pope and himself, but there is nothing in the case to show that the renewal note was not as good as the original. If the executor is to be held liable at all, it must be for not having called in the debt in order to re-invest it, "in bank stock or otherwise," as prescribed by the will. If he had done so, and invested in "bank stock" (the security which seemed to be preferred by the testator, and therefore to be preferred by the executor), it would have been wholly lost to the estate, and in that aspect of what might have been, it was best for the *cestuis que trust* that that course was not pursued. But if the trustee had any discretion to invest otherwise than in bank stock, why should he not leave the money where it was, in the hands of a man of great wealth and spotless integrity? Where would he have found a better investment, or one more likely to prove good under all circumstances? It remained perfectly good until the conquest of the State by the Northern armies and the destruction of property and values consequent thereupon.

If anything has been lost to the plaintiffs, therefore, it is attributable, not to the omission or failure of the executor, but to the disasters of war. What justice or equity is to be promoted by holding a trustee liable under such circumstances? On the contrary, does it not shock the sense of natural justice to hold one thus liable? If, however, the principles of equity as administered in this State from motives of general policy, require this sacrifice of natural equity, then, however subversive of our sense of right, the executor here must be made the victim.

England, the country from which we derive our laws and system of jurisprudence, has never passed through a crisis like that which destroyed this State and swept away nearly all securities, public and private, and the enlightened judges of that noble commonwealth were therefore never called upon to consider how far such circumstances might modify the rules regarding the liability of trustees, laid down by them for an ordinary and normal condition of affairs. In this State, how-

·ever, we have precedents almost identical, arising out of the ·destruction of values here during the Revolutionary war.

[The learned judge here cites and considers the following cases: *Morton* v. *Smith,* 1 *Desaus.* 123; *Webb* v. *Bellinger,* 2 *Id.* 508; *Thompson* v. *Wagner,* 3 *Id.* 103; *Stukes* v. *Collins,* 4 *Id.* ·207; *Edmonds* v. *Crenshaw, Harp. Eq.* 224; *Doud* v. *Sanders, Id.* 277; *Massey* v. *Cureton, Chew Eq.* 187; *West* v. *Clark,* 1 *Strobh. Eq.* 185; *Monk* v. *Pinckney,* 9 *Rich. Eq.* 293; *Martin* v. *Jefcoat,* 10 *Id.* 118; *Taveau* v. *Ball,* 1 *McCord Ch.* 464; *Bryan* v. *Mulligan,* 2 *Hill Ch.* 364; *Glover* v. *Glover, McMull. Eq.* 154; *Hext* v. *Porcher,* 1 *Strobh. Eq.* 171; *Boggs* v. *Adger,* 4 *Rich. Eq.* 410.] ·

These cases were decided before or during the continuance in office of this executor. If he consulted the law for his guidance, these are the cases to which he was referred by his counsel. He found in them all the same enlightened, reasonable and humane principles which pervaded the old case of *Morton* v. *Smith.* He found that he was only required to act with the same care, circumspection and diligence which a prudent man would exercise under the same circumstances, honestly and " for the best." That if he did not violate any of the provisions of the law, or of the will of the testator, and fairly and honestly performed his duty, as he deemed best for the estate, he would not be answerable for consequences which he could not foresee or provide against.

It may be supposed that the view here presented is not the proper one; that the renewing of these notes was, in effect, the same as a collection of the money and its re-investment in the new notes; that this was a violation of duty on the part of the executor, inasmuch as he was directed by the will to invest in "bank stock or otherwise." An investment in bank stock would not, perhaps, have yielded as much profit to the estate as did these notes; for, since the war, the executor has realized on them a ·considerable sum of money, whereas the bank stock would, at most, certainly have been a total loss.

But, although bank stocks appear to have been preferred by the testator, the direction was not positive to invest in them. But a discretion was allowed the executor to invest either in bank stock "or otherwise." What, then, was the alternative presented by this word "otherwise"?

In England it would have been held to imply an investment in such securities as the court would approve, to wit, consols. But here we had at that time no rule prescribing what kind of investment should be made by executors or trustees. This is admitted by the late Chief Justice, in *Nance* v. *Nance* (1 *S. C.* 218). "In this State," says he, "while the principles of equity from which the English rule was deduced are recognized and enforced, the rule itself has undergone modification to suit the circumstances of the country. No case is found localizing the English rules on the subject of personal securities in this State." The nearest approach to it is in *Spear* v. *Spear*, 9 *Rich. Eq.* 184, where a guardian, engaged in trade, had employed the funds of his ward in the hazards of mercantile enterprise. The court was "of opinion that the guardian should change, as soon as practicable, the investment of the funds of his ward into public securities, or bonds secured by a lien on real estate, or, at least, bonds of third persons with proper securities."

But this laid down no rule for other cases. Executors were left to their discretion as to the character of their investments, subject only to the rule found in all our cases, that they should use proper diligence, and act in good faith and "for the best." There was good reason for not laying down any arbitrary rules of that sort. Public securities were here very few, and little known to our people. They were a rural population, engaged almost wholly in agriculture, and the great bulk of their wealth was invested in slaves. No investments were so much sought after, and few were so readily available as those based upon property of this character. Our people were often characterized by a very high sense of honor in regard to the obligations of debtors, as may be seen from the evidence in this case. Some of the witnesses state that it would have been regarded as an insult to ask of a debtor the security of a mortgage on lands,

and that such securities were very unusual. The fact is, that the note of a man of large estate in land and slaves, a man of position and high character, and not embarrassed with debt— such a man as Judge O'Neall appears from the testimony to have been—was based upon the security of the lands and negroes which he owned, and there is little doubt that, if this executor had applied to the Court at that time, to sanction his transactions with that distinguished gentleman, he would readily have obtained it.

Be this as it may, there was no arbitrary rule by which he was bound, and hence, when the executor was left to his discretion, to invest in bank stock "or otherwise," he was at liberty to invest in personal securities which were undoubtedly good at the time, and likely to remain so, and did remain so until destroyed by war. But the referee (to whose learning and industry I am much indebted in this case), says that he is unable to find any case where the executor was exonerated where he failed to take security on a note. On the other hand, we have not been referred to any case in this State, where an executor has been held liable for such a failure, before that of *Nance* v. *Nance.* It is not here intended to impugn the authority of the case of *Nance* v. *Nance,* but it certainly did lay down a rule which, however right and proper in the present condition of our affairs, had never before been recognized in this State. To hold this executor bound by the law, as pronounced in that case, would be to violate the principles laid down in all the cases which preceded it, as understood and applied by our most eminent judges.

This, however, is not the case of a trustee, who, having funds in his hands which it is his duty to invest, does invest them in securities not recognized as proper. I distinguish the case thus: This executor merely failed to call in these debts, leaving the money out on such securities and in the hands of such persons as testator himself had considered worthy of trust and confidence. In so far as he changed these securities, they were not materially altered; that he exercised a discretion allowed him by the will; that he acted in good faith, with proper prudence, and for the best; that the security remained perfectly

good until affected by the war, which the executor could neither have foreseen nor provided against; and lastly, that any other investment which he might have made, and especially of the sort preferred by the testator, would in all probability have resulted in equal or greater loss to the estate.

The case of the Ramage note is not exactly the same. That was a loan of money of the estate by the executor, in 1860, upon a note without security. He did require security, and Ramage agreed to give it, but the war came on and it was not given. Ramage was in good credit, and solvent at the time, but was ruined by the war. In this case, the negligence imputed to the executor was, that he parted with the money before the surety signed the note. I do not think this sufficient to charge him. It was an unfinished transaction, and the question is whether, if, in the progress of a negotiation of this sort, an executor entrust a man in good circumstances and credit with the funds of the estate, upon an assurance that the contract will be completed, would he be guilty of such negligence as to charge him. If that were so, then he would be liable if he gave up a note or other security to a debtor in good credit, who gave him for it a check on the bank, which was not paid.

In Lord Hardwicke's time, it was held that "where a receiver pays money to a tradesman, and takes bills for the same, in order to remit to London, if he was in credit at the time, though he fail soon after, it shall not affect the receiver." *Knight* v. *Lord Plymouth*, 3 *Atk.* 480; *Dick.* 140.

There must be some trust somewhere, and the business of life could not get on without it. If Ramage was a man to be trusted in this way (and from the testimony it must be inferred that he was), I do not think the executor was guilty of such negligence as to charge him. Moreover, if the money had not been let out as it was, it would in some form have shared the general wreck of all things brought on by the war; and it is very difficult to say that the estate lost anything by the transaction.

The estate should pay the costs of this litigation. It was scarcely possible that the estate could have been settled without litigation, and the executor is not responsible for the condition

of the business. He was not responsible for the various delays attending the references.

The referee was the judge of the propriety of granting the continuances, and, having granted 'them without imposing terms at the time, they are not now to be imposed. Furthermore, no question is made of the fidelity and honesty of purpose of the executor. * * *

It is ordered, adjudged and decreed, that the report be confirmed and made the judgment of this court, except as herein modified; that as to those points wherein the exceptions have been sustained, it be referred to the master to correct the said report and to modify the same, so as to make it conform to the principles of this decree.

From this decree the plaintiffs appealed, alleging error in discharging the executor from liability for the O'Neall and Ramage notes, and in requiring the costs to be paid out of the estate.

*Messrs. James Y. Culbreath* and *J. S. R. Thomson,* for appellants, cited the cases referred to in the Circuit decree and also the following: 1 *S. C.* 279, 458; 3 *Id.* 451; 4 *Id.* 366; 7 *Id.* 324; 8 *Id.* 244; 9 *Id.* 490; 14 *Rich. Eq.* 300.

*Messrs. L. J. Jones, G. S. Mower* and *Ernest Gary,* contra.

June 29th, 1883. The opinion of the court was delivered by

MR. JUSTICE ALDRICH. In *Witherspoon and Wife* v. *Watts et al., Ex'rs,* I stated why I have been delayed in filing the opinion assigned me in that case, which also applies to this. *Ante p.* 396.

This is an appeal from the decree of his Honor, Judge Kershaw, which is so full and convincing, so well sustained by reason and authority, that it is hardly necessary to enlarge on what he has so strongly enforced. The decree collates the authorities on which the judgment of the court is based. The proposition is that a trustee is not liable if he discharges his trust with the same care and prudence that a prudent man will use in the transaction of his own affairs. As was said in *Doud*

v. *Sanders, Harp. Eq.* 277, executors " are always protected by the court when they have acted conscientiously and for the best." Also in *Glover* v. *Glover, McMull. Eq.* 154, " When an executor acts upon a rule established by the habits of society, and in some degree from necessity, it ought not to be imputed to him for negligence." And so, in *Hext* v. *Porcher,* 1 *Strobh. Eq.* 171, "A trustee here is required to act faithfully in the interests committed to him, but the general management is left to his discretion."

This court has not the slightest inclination to interfere with the rule laid down in *Nance* v. *Nance,* 1 *S. C.* 218. But the question now presented is, Does the rule apply to a transaction completed before that case was decided? The testator, Jacob Pope, by his will, made Bud C. Mathews, his brother-in-law and trusted friend, his executor. In the will he gave the executor power to sell a portion of the estate, " and to invest the proceeds of the sale and the cash and choses in action, in bank stock or otherwise." He died in 1849. Among the assets were two notes, one of the late Chief Justice O'Neall and of Pope and O'Neall, the latter being the surety of Pope. Pope died, and O'Neall was appointed his administrator. There was also a note of Ramage. The executors allowed O'Neall to renew his notes, but took no sureties. He also permitted Ramage to renew his note, but required him to give security. Ramage failed to add a surety to his note; the war coming on it seems to have been overlooked in the excitement.

The special objects of the testator's bounty were his widow and his grandson, Rutherford, the sister and nephew of the executor. These plaintiffs only take an interest in the estate of the testator in case of the death of these special objects of his love. The widow, after the payment of some legacies, was to receive the whole estate for life—Rutherford, after her death, when he arrived at the age of twenty-one years. The plaintiffs, in case of the death of Rutherford, without leaving issue then living, to take the estate when they arrived at the age of twenty-five years, which would be in 1865 and 1867.

The referee, Mr. Caldwell, in his report, charged the executor with the notes of O'Neall and Ramage. The case was heard on

exceptions to that report. Judge Kershaw, in a very carefully considered decree, overruled the referee, and decided that the executor is not liable. The question submitted by the appeal is to reverse this decision.

As I have said, the rule in *Nance* v. *Nance* is approved, but is it just and equitable to apply that rule to this case? It has always been the law in this State, " that the trustee is answerable for those losses only which are occasioned by such acts or omissions as a prudent man could not do or omit in his own affairs." So it is said in *Nance* v. *Nance*, " The rule as laid down was intended to define the responsibility of trustees while acting within the limits of their discretion, and not to give support to the ideas that the discretion was unlimited as to the character of investments, and their responsibility measured solely by the purity of their motives and the degree of care exercised in the control of the trust fund."

It appears, from the evidence, that the O'Neall and Ramage notes were perfectly good up to the close of the war; that the executor was advised by the judge not to put money in bank stock, but to put it out at interest in notes on individuals. The referee, in his report, says: " The parties executing the notes appear to have been good at the time, and it is not the executor's fault that they are not so now. He has kept the funds separate from his; he has been diligent; he appears to have been perfectly honest; and he thus seems to have acted with that fidelity and sagacity which the great current of decisions in this State pronounce sufficient for a fiduciary's exoneration." He absolves him from all liability for funds and property held by him before and during the war, except the O'Neall and Ramage notes.

At first, I was disposed to think the learned judge was in error; but after carefully considering his decree and reviewing the authorities he has adduced in support of it, I have come to the deliberate conclusion, that it will not only be a hard case to charge this executor with the O'Neall notes, but that it will violate every principle of equity by which this court has heretofore been governed. Undoubtedly, up to the close of the war, the note of Judge O'Neall was a perfectly safe investment; not a shadow of suspicion could be cast on his paper; in addition to

his exalted character and large estate, it was not the custom of the community to require mortgages, and it was common to lend money to solvent men without taking a surety. If we add to this the fact that the testator himself had invested in Judge O'Neall's paper, without additional security, how can it be said that this trustee did not act as a prudent man would with his own, especially, too, when he was acting under the counsel and advice of one of the highest legal authorities in the land? That he did not collect the note, is not worthy of consideration. Why collect money, directed to be invested, to lend it out again immediately? Why call in what was then considered as good an investment as the country afforded, to re-invest it in another note, not better, if so good?

The Ramage note is somewhat on a different footing. As regards this investment, the executor did require a surety; but he let Ramage have the money before the surety was given, thus showing that he was entirely satisfied that the note with only Ramage's signature was perfectly good, in which judgment he is fully sustained by all the evidence. The excitement and confusion of the war prevented the completion of the arrangement. It may be said, that he did require a surety showed he was not satisfied with the safety of the investment; but this idea is negatived from the fact that he let Ramage have the money without the surety, and by the abundant testimony as to his solvency and ability to meet his engagements at any time before the disaster of defeat. In addition, the learned judge who heard the cause, was satisfied the executor acted as a prudent man would in the management of his own affairs. I think so, too, for it is more than probable that any surety Ramage may have offered would not have been better than himself, and would, like him, at the close of the war, been broken up and ruined. Would it be equity to say now, because the executor, in the exercise of his discretion, or, if you will, by accident, and occasioned by the confusion and excitement of the war, did not do that which, at first, he intended to do, and which, if he had done, would not have made the fund any more secure, or benefited the estate, shall now be liable for an investment that, under any circumstances, would be worthless? I think not. Besides, this is a question

of fact which the Circuit judge, after full hearing and careful deliberation, has decided in favor of the executor; and as no principle of law has been violated, and the will committed the general management of the estate to his discretion, this court will not depart from its practice and overrule the decree on a question of fact, supported by the evidence.

Costs follow the judgment, and there is no error here. The appeal is dismissed.

MR. JUSTICE McIVER. As I am unable to concur in all of the conclusions reached by his Honor, Judge Aldrich, to whom was assigned the duty of preparing the leading opinion in this case, I propose to state, as briefly as practicable, my views of the questions involved. [Here follows a statement of the case.]

These notes, so far as the question of the liability of the executor for the amounts thereof is concerned, seem to me to stand upon different grounds. The individual note of Judge O'Neall, given for the amount of his own note to the testator, is manifestly nothing but a renewal of a note in which the testator had seen fit to allow a portion of his funds to remain invested for a considerable length of time before his death, and as the executor was charged with the duty of investing the funds of the estate until the period arrived for turning it over to the parties entitled under the will, I am unable to see any breach of trust on the part of the executor in allowing this amount of the fund to remain in the same way in which the testator had for a long period kept it invested. I agree, therefore, that the executor is not chargeable with the amount of this note.

The other note of Judge O'Neall stands upon a different footing. There is no distinct finding of fact as to what was the intention of the parties in the transaction out of which this note arose; whether the note of Judge O'Neall was taken in satisfaction or payment of the note of George Pope, and the debt of Thomas H. Pope, or whether it was taken as a simple renewal of those debts. The referee, in speaking of the transaction, says that the defendant "allowed Judge O'Neall to take up this note with his own note, for the sum then due," &c., while the Circuit judge, in speaking of the O'Neall notes, uses this lan-

guage : " These notes were never collected by the executor. They were simply renewed ; the debt remained the same. It is true the note of Judge O'Neall alone was taken as a renewal of the joint and several notes of Pope and himself, but there is nothing in the case to show that the renewal note was not as good as the original."

The most natural inference is that the object of the transaction was, as the referee says, " to take up " or extinguish the original note, thereby releasing the estate of George Pope from any further liability thereon, so as to enable his executor to proceed with the settlement of his estate ; and when to this is added the undisputed fact that to the amount of that note was added another debt due by another person—the sum of $1,000 due the estate of Jacob Pope by Thomas H. Pope, with which Geo. Pope does not seem to have had any connection—the inference seems irresistible that the object was, not simply to renew the original note, but to extinguish the debt secured thereby, as well as the independent indebtedness of Thomas H. Pope, which, for some reason not disclosed in the testimony, Judge O'Neall was willing to assume, and create a new debt on the part of Judge O'Neall to the executor.

If this be so, then the practical effect of the transaction was that the defendant, as executor of Jacob Pope, collected both of these debts, as well the one due by Thomas H. Pope as the one due by George Pope, and re-invested the amount thereof in the individual note of Judge O'Neall, without any security of any kind. The legal question presented then, is whether an executor charged with the duty of investing the funds of his testator's estate, as this executor was, is at liberty to invest such funds in the note of a private individual without security of any kind. I am not aware of any case in which such an investment of trust funds has ever received the sanction of any court, and, on the contrary, there are at least two cases in which such an investment has been condemned. *Spear* v. *Spear*, 9 *Rich. Eq.* 184 ; *Nance* v. *Nance*, 1 *S. C.* 209.

In citing the last-mentioned case, I desire to say that while I have no fault to find with the judgment of the Court in that case, I have never been able to approve that portion of the

opinion which undertakes to prescribe the limits within which a trustee is at liberty to exercise his discretion. It does not seem to me that the authorities in this State warrant the use of the following language in the opinion, where, in speaking of the character of the securities in which a trustee may properly invest trust funds, it is said: "Such securities should primarily consist of mortgages of unencumbered real estate, of a value sufficient to guaranty the debt against all contingencies liable to occur or capable of being foreseen. Bonds of individuals should not be taken in lieu of real securities unless unobjectionable investments cannot, in the exercise of reasonable diligence, be procured. When personal securities are taken in lieu of real, it will devolve upon the trustee to make the necessity and propriety of such investments appear, upon an accounting with the *cestui que trust.*"

On the contrary, my understanding of the matter is that we have no rule here prescribing the classes of securities in which trust funds shall be invested, or the preference which is to be given to one class over another; but all that is required is that a trustee shall invest the funds committed to his care upon good and sufficient security. This is the limit of his discretion, and if, within this limit, he manages the funds entrusted to him with the same care and diligence that a prudent and cautious man bestows upon his own affairs, he will not be liable, even though loss may ensue. But where a trustee goes beyond this limit and invests trust funds without any security at all, he cannot escape liability for any loss that may ensue, even though he may be able to show that he has acted in good faith; for, by failing to take security, he substitutes himself as such, and must account accordingly.

It seems to me, therefore, that the executor is chargeable with the larger note of Judge O'Neall, given to take up the note of George Pope, as well as for the $1,000 due by Thomas H. Pope. But, as I understand that the executor has already been charged with such amounts as he has received on this note since the termination of the war, from the assets of Judge O'Neall's estate, the amounts so received should either be stricken from the account already taken, or be allowed as credits to the executor

on the amount of this note, so as to avoid charging the executor twice with the same.

For a similar reason, it seems to me that the executor should be charged with the Ramage note. This was a clear investment of trust funds, without any security whatever, and the fact that the executor intended to take security and failed to do so, only makes the case stronger against him. The excuse suggested for such failure, that the war came on, and, in the excitement and confusion incident to the times, it was overlooked, does not appear to me to be a sufficient reason for such neglect. The note bears date April 6th, 1860, more than eight months before the State seceded, and more than twelve months before hostilities actually commenced. There was, therefore, ample time before these stirring events occurred, for the executor to have arranged this matter, even if he could be excused for letting out trust funds without taking security at the time. It seems to me that the investment of trust funds stands upon a very different footing from accepting payment of a debt in a check upon a bank which proves to be worthless. A trustee might well be excused for doing the latter, as that would be in accordance with the usual course of business, but I do not think it a usual or proper practice for a lender to advance the money to a borrower before the required security has been given.

The question of costs is a matter peculiarly within the discretion of the Circuit Court, and in my opinion the Circuit judge, under all the circumstances of this case, wisely and properly exercised his discretion in requiring the costs to be paid out of the estate.

I think, therefore, that the judgment of the Circuit Court should be modified in accordance with the views herein announced, and that the case should be remanded to that court for such further proceedings as may be necessary to carry out these views.

Mr. Chief Justice Simpson. There being no testimony in this case showing either bad faith or negligence on the part of the trustee, on the contrary it appearing that the loss complained of occurred from causes which could not have been foreseen by

him, I think under the circumstances he should be held harmless, especially as under the terms of the will he was invested with large discretion in the management of the estate entrusted to his care. I do not agree, however, with the remarks of Judge Aldrich, in reference to the case of *Nance* v. *Nance*. On this subject I concur with Judge McIver in the dissenting opinion, but this does not affect the result. I therefore concur in the general results herein.*

Judgment affirmed.